## SURÍS *v.* QUIÑONES ET AL.

### APPEAL from the District Court of Mayagüez.

No. 439.—Decided May 25, 1911.

ACTION OF EJECTMENT—UNSWORN AMENDMENTS TO A SWORN COMPLAINT—
FAILURE TO ANSWER AMENDMENTS.—When a sworn complaint which is answered in due form by the defendants is amended, and such amendments do not state essential facts in the case, and are unsworn, upon failure to answer said amendments the court is not thereby compelled to declare as true the facts stated in the amendments, for, even assuming that facts essential to the case are stated therein, the court could not hold as true and proved the facts alleged in the original complaint which were denied in due time.

DENIAL UPON INFORMATION AND BELIEF—FACTS STATED IN PUBLIC DOCUMENTS.—
Even when the facts stated in a complaint and denied in the answer are contained in public documents, a defendant who has not personally intervened in said documents may base his denial upon information and belief, and he is not compelled by virtue of a sworn complaint to examine all the archives to ascertain the truth of the facts stated in said complaint.

ID.—ANSWER TO COMPLAINT—DENIAL OF ESSENTIAL FACTS OF COMPLAINT—CONCLUSIONS OF LAW.—The defendant is obliged to deny the essential allegation only of the complaint, and in his answer may disregard the conclusions of law alleged therein; but if he denies them in his answer, it is not for that reason void or defective.

ID.—DENIAL OF PART OF FACTS STATED IN PARAGRAPH.—When a paragraph of the complaint contains facts which in part are true and in part untrue, the defendant should deny each part separately.

VALIDITY OF PRIVATE INSTRUMENTS—LACK OF TWO WITNESSES—OBLIGATION.—In accordance with Law I, Title I, Book I, of the *Novísima Recopilación*, a man is bound in any manner in which he may desire to bind himself, and a private document because it lacks the signatures of two witnesses is not void.

ID.—PUBLIC INSTRUMENTS—CONSTRUCTION OF LAW—WITNESSES TO PRIVATE INSTRUMENTS.—The provisions of Law LXI, Title XVIII, of the third *partida*, refer to the requisites of public instruments, which are the same as exacted by our notarial and mortgage laws and are not applicable to private documents, to which the signatures of two witnesses are not required.

THIRD PARTIES—KNOWLEDGE OF EXISTENCE OF CONTRACT—SALE—POSSESSION OF THING SOLD.—The character of third party cannot be invoked by a person who, although not intervening in a contract of sale, buys with the knowledge that his vendors are not the owners nor were in possession of the thing sold.

ADMISSION OF EVIDENCE—UNFOUNDED OBJECTIONS.—Objection having been made to the admission of a document on the ground that the signatures appearing at the foot thereof are false, their authenticity having been proved at the

trial, it is presumed that the party objecting to the admission thereof re-
nounces all other objections.

ACTION OF EJECTMENT—PRESCRIPTION—JUST TITLE AND GOOD FAITH.—Ten years
of possession with just title and in good faith of the property it is desired
to recover having elapsed as to persons present, the possessor acquires do-
minion thereof by prescription.

The facts are stated in the opinion.

Messrs. J. S. Amill Negroni and Fernando Vázquez for
appellant.

Messrs. Benito Forés and Antonio Sarmiento for re-
spondents.

MR. JUSTICE MACLEARY delivered the opinion of the court.

This is an action brought by Surís against Quiñones and
the Bank of Porto Rico to recover a certain tract of land
containing 40 acres and the mesne profits of the same, in
which judgment was rendered in favor of the defendants
on May 17, 1908.   Some necessary delay has occurred on
account of the very voluminous record and the sickness and
subsequent demise of the justice of this court to whom the
case was first assigned as *ponente* in the preparation, sub-
mission, and consideration of the questions involved.   The
suit was filed on December 17, 1907, by Juan Surís Car-
dona against Francisco P. Quiñones and the Bank of Porto
Rico, seeking recovery of a rural estate and its fruits.   The
complaint is very extensive and sets out the facts in detail
on which the plaintiff relies; but the whole matter taken to-
gether amounts to an action of ejectment, claiming the title
and possession of the lands described and the mesne profits
of the estate which is sought to be recovered.   The prayer
of the complaint being divided into four paragraphs amounts,
in substance, to seeking the recovery of the title and the pos-
session of the 40 acres of land sued for and $2,000 dam-
ages for its detention, and such further damages as may
accrue between the institution of the suit and the rendition
of the judgment, and for all costs of the suit.

The two defendants made answer separately, Quiñones
denying nearly all the allegations in the complaint for lack

of sufficient information, some of them expressly, and others in a qualified manner. He further alleges, as new matter of defense, possession of the property sued for, in person, since August 14, 1905, and through former owners, from whom he derived his title, up to a long time before 1887, pleading prescription or the statute of limitations. He further denies that the plaintiff ever had possession of the property in controversy, or ever paid any taxes thereon, or ever rendered the same for taxation. Defendant Quiñones also alleges that the titles to the land in controversy, under which he claims, had been duly registered according to law. Wherefore he prays that the complaint be dismissed with costs against the plaintiff. The other defendant, the Bank of Porto Rico, makes a similar answer.

A trial was had before Judge Schoenrich in the district court, in which a vast amount of oral and documentary evidence was introduced, and, finally, on May 7, 1909, the trial judge found the law and the facts in favor of the defendants and dismissed the complaint with an order for costs against the plaintiff. From this judgment an appeal was prosecuted, and the case was vigorously contested in this court both by elaborate briefs and extended oral arguments, and it is finally in our hands for decision. Then let us examine the questions raised in the suit.

During the years from 1860 to 1870 the brothers, José Salvador and Ramón María Surís, purchased from different persons, by means of public deeds, several parcels of land, up to the number of 17, situated in the ward of Sabaná Eneas of San Germán, of 16 of the deeds to which parcels of land they have filed certified copies in this suit.

On November 26, 1870, both brothers acknowledged to have received from the Charity Hospital at San Germán the sum of 6,000 crowns, Spanish currency, and in order to guarantee the said amount and the interest on the same, they mortgaged, in favor of said institution, 40 acres of land, which they said were a part of the 70 acres of low-

lands which they possessed and owned in the ward of Sabaná Eneas, and which were bounded on the north and west by the plantation "Carolina"; on the south by the road leading from Cabo Rojo to San Germán; and on the east by other lands of Messrs. Surís; and they proved their ownership of the mortgaged lands by a certificate issued by the land surveyor, Carlos B. Hernández, on the 15th day of the previous month, which certificate they exhibited in order that it might be annexed to the document; and also by the deeds of purchase of 16 out of the 17 parcels of land above mentioned, which titles were described in the mortgage deed. The aforesaid certificate of the land surveyor, Hernández, shows that he had drawn a map and calculated the area of a parcel of 70 acres of lowland, which is bounded on the north by the plantation "Carolina" and lands belonging to the heirs of Máximo Quiñones; on the east by the plantation "Cristina"; on the south by the road leading to Cabo Rojo and lands of Esteban Bartoli; and on the west by the plantation "Carolina" and lands belonging to the heirs of Máximo Quiñones.

The aforementioned mortgage was recorded in the books of the former registry of mortgages on November 29, 1870.

Twelve years later, on February 15, 1882, by a public deed the brothers, José Salvador and Ramón María Surís, after making a statement of their 17 title deeds, consolidated the 17 parcels of land, because, as they stated, said lands were adjacent to each other, and they formed of the same a single estate, to which they gave the name of "Perseguida" and which contained 40 acres of land situated between the following landed properties: On the north, the plantation "Carolina," property of Vélez Borrero; on the south, the road leading to Cabo Rojo; on the east, other lands of the brothers Surís; and on the west, the plantation "Carolina." This consolidated property, the value of which they fixed at $3,000, was recorded in the name of the aforesaid brothers in the Registry of Property of San Germán, in

which were mentioned the different titles to the consolidated estate and the mortgage constituted on the latter, as a guarantee, in favor of the charity hospital.

After the death of Ramón María Surís in the year 1900, his widow and children were declared to be his heirs, by a judicial decree of April 20, 1907, and they presented said document in the registry of property, where it was recorded on June 24 of the same year, 1907, with regard to the co-ownership of one-half of the undivided estate "Perseguida."

By the public deeds of July 14 and 22, 1907, José Salvador Surís and the widow and children of Ramón María Surís sold to Juan Surís Cardona the whole of the aforesaid estate "Perseguida," for the sum of $5,500, which they acknowledged to have received prior to said sales, and the latter were likewise recorded in the corresponding registry of property.

A few days after the aforesaid deeds of sale had been made they executed, on the 12th of the following month, another deed, in which the vendors stated that they had not been able to deliver the estate to the purchaser thereof, because at the time the sale was effected said estate was illegally occupied by Francisco Plácido Quiñones, who had possessed the same since November 19, 1906; and up to that date said property had been in the possession of the Bank of Porto Rico, which had possessed the estate since August 14, 1905; and since the latter date, said vendors had not received from any one any sum of money for rents, produce, or profits derived from said estate, for which reason they ceded and transferred to the purchaser, Juan Surís Cardona, their rights and actions in order that he might claim the revenue that had been produced, or should have been produced, by the estate sold to him.

Such is the history of the estate "Perseguida" of 40 acres of land according to the registry of property, and the plaintiff, availing himself of the same, brought an action for

recovery against Francisco Plácido Quiñones claiming also the revenues of the estate in order that the latter might be restored to him together with said revenues; and the Bank of Porto Rico answered in this action on account of having been summoned by the defendant for the purpose of eviction.

The facts on which the plaintiff bases his complaint are: That the aforesaid estate "Perseguida," which is also known by the name of "Charity Hospital Estate" in consequence of the mortgage constituted thereon, is illegally, and without any title whatever, occupied by the defendant, Francisco Plácido Quiñones, inasmuch as the owners of said estate have never sold the same to him, nor to any other person; that the brothers Surís sold to Pablo Ma. Stefani two parcels of land, one of 20 acres, and another of 34.9 acres; both of which parcels of land were bounded on the south and west, respectively, by the estate "Perseguida" or "Charity Hospital Estate"; but that the latter was not sold but leased to him in the year 1883, and that he kept the same in this manner until his death. That after the death of Stefani, Schulze & Co. prosecuted executory proceedings in order to collect from his succession a certain mortgage which said Stefani had constituted on the two parcels of 20 acres and 34.9 acres of land, purchased from the brothers Surís, and on other lands belonging to him; and when said lands were adjudged to them, Schulze & Co. leased from the two brothers Surís the 40 acres of the estate "Perseguida" or "Charity Hospital Estate" together with other lands belonging to the said brothers Surís and to the Misses Surís, which lease was made by means of contracts concluded by them; and that afterwards, when Schulze & Co., in 1889, executed a deed of consolidation of the plantation "Imiza," which they had acquired from the Succession of Stefani, they paid no attention to the boundary of the hospital tract, and by the description which, without said boundary, was made of the plantation "Imiza," the estate, which is the property of the plaintiff,

was inclosed within said plantation; and under these circumstances the property "Imiza" of Schulze & Co., in liquidation, was, together with "La Perseguida," afterwards sold at auction by the Bank of Porto Rico and adjudged to the latter in the year 1905, being subsequently sold by said bank to Francisco Plácido Quiñones.

The allegations of the aforesaid complaint were denied by Quiñones and by the Bank of Porto Rico; and the former stated that he did not illegally possess lands of any one, but that he legally, in good faith, and by a just title, possessed the lands that he had purchased from the Bank of Porto Rico by a deed executed on November 19, 1906; and as new matter he alleged that he possesses the lands purchased in good faith in the same good faith in which they were possessed by the Bank of Porto Rico and by Schulze & Co., from the time when they were adjudged to the latter in a suit prosecuted by them against the Succession of Stefani, by whom they were likewise possessed in the same manner (i. e., in good faith) for a long time prior to the year 1897, in which year he died; that José Salvador and Ramón Ma. Surís have always resided in San Germán at a short distance from the estate possessed by the defendant, and that said brothers always attended to the management of the lands of their sisters, Margarita and Cristina; that the plaintiff and his vendors have never possessed the property which they claim, nor have they rendered the same as belonging to them for the purposes of taxation, and that the municipal council of San Germán, about the year 1880, sold at auction 12 acres of the aforesaid property, notwithstanding which fact they said in the deed of consolidation that they possessed the 40 acres; that the plaintiff is a son of José Salvador Surís, and a cousin of the other vendors, with all of whom he maintains the most cordial and intimate relations; and, lastly, that from the time of Stefani up to the time of the defendant—that is, from before 1887—at which time the possession of the former commenced, all parties have

possessed the lands which constitute the plantation "Imiza" as owners of the same, in a public and peaceful manner, without interruption, and by titles which were recorded in the registry of property; for which reason he alleges the ownership thereof by prescription.

As to the Bank of Porto Rico, said bank likewise denied the material facts of the complaint, and both prayed that said complaint be dismissed.

After having heard the evidence at the trial, the District Court of Mayagüez rendered judgment on May 7, 1909, declaring that the facts and the law were in favor of the defendants and dismissing the complaint with the costs against the plaintiff. From said judgment the latter took an appeal to the Supreme Court on the 26th of the same month, and a transcript of the record, with a statement of facts and written briefs, were filed in said Supreme Court by all the parties to the suit, who also made oral arguments at the hearing.

From the evidence introduced at the trial the history of the estate "Perseguida," of 40 acres of land, appears exactly as we have narrated the same at the beginning, and, likewise, other facts are narrated which occurred during the lapse of years comprised in said history.

Several years after the execution of the mortgage deed in favor of the charity hospital, which deed, as stated above, was executed on November 26, 1870—that is to say, about the year 1878—it appears, according to a certificate issued by the municipal council of San Germán, that the brothers José Salvador and Ramón María Surís owed more than 3,000 francs for taxes; and that, for the payment of the same, 12 acres of land which they possessed in the ward of Sabaná Eneas were attached on June 15, 1878, and sold at auction and adjudged to the municipal council, which, in turn, sold the same soon afterwards to a third person. In the judicial proceedings which were instituted on account of said affair, José Salvador and Ramón Ma. Surís presented a writing,

requesting that the execution be levied upon other property because the lands that had been sold were mortgaged to the charity hospital; but said petition was dismissed.

From certificates issued by the same municipal council, it appears that, according to the documents relating to the assessment of taxes on agricultural properties and general taxes during the years from 1883 to 1900, there is no evidence in any of said fiscal years that any taxes were imposed upon Surís Hermanos, or José Surís, or Ramón Surís for the possession of the aforesaid 40 acres of land, nor have they rendered the latter in the Treasury of this Island for the payment of taxes from the year 1900 up to the present time.

One year after the public sale of the 12 acres above mentioned—that is to say, in March, 1879—Surís Hermanos declared themselves insolvent before the Court of First Instance at San Germán and surrendered their property in favor of their creditors, among whom they included the charity hospital; and in the statement of their property there figured as the only real property 100 acres of land in Sabaná Eneas, which were bounded on the north by the plantation "Carolina"; on the south, by the road leading to Cabo Rojo; on the east, by the lands of the Misses Surís, and on the west, by the plantation "Carolina." A house of stone rubble work and an engine house formed part of said real estate.

On July 8 of the same year the manager of the charity hospital instituted executory proceedings against José and Ramón Surís for the collection of the mortgage debt and the interest due thereon; and on the 11th of the same month and year an order for attachment and execution was issued by the judge, but the brothers Surís requested that said executory proceedings be joined with the bankruptcy proceedings which request was refused by the Court of First Instance and granted by the Territorial Court on August 20, 1880.

The executory proceedings instituted by the hospital were again prosecuted, and on February 8, 1882, the two brothers

Surís were required to pay, which they refused to do for
the reason that inasmuch as no resolution had been passed
to desist from the bankruptcy proceedings, and the attach-
ment by which their property was encumbered had not been
raised, they had no personal capacity to comply with the
aforesaid requisition because they were in bankruptcy and
had no property with which to pay.

In view of this answer, the bailiff on the following day,
February 9, 1882, attached and delivered to Pablo Ma. Ste-
fani, as a deposit, 100 acres of land which had the same
boundaries as the land which, in the bankruptcy proceedings,
had been declared by the aforesaid brothers Surís to be
their property.

After this proceeding had been taken, the executory pro-
ceedings were no longer prosecuted, nor was any order
issued to the Register of Property at San Germán for the
entry of the attachment, which was ordered by a decree of
the following day, February 10, 1882; but, on the same day
on which the attachment was issued the following private
document was executed, to wit:

"Let it be known by this document that we, the undersigned,
have agreed and stipulated as follows:

"First. Mr. José S. Surís and Mr. Ramón Surís are indebted
to the hospital of this city in the amount of three thousand (3,000)
dollars, Spanish currency, together with the interest due thereon
for 9 months and — days, and the costs caused by the executory
proceedings that have been prosecuted, for the payment of which
they have mortgaged forty acres of land which they possess in the
ward of Sabaña Eneas of this district.

"Second. Mr. Pablo Stefani purchases from the aforementioned
Surís brothers the said forty acres for the sum of five thousand eight
hundred dollars, it being understood that the Surís brothers are
to execute the deed of conveyance in favor of the manager of the
hospital for the amount of the principal and interest of the debt
due to said institution according to the liquidation to be made.

"Third. The sum remaining of the aforesaid five thousand eight
hundred dollars, after the balance resulting from the liquidation
has been covered, shall be used by Stefani to pay five hundred dol-

lars for fees due to the attorney Font, and the other costs and fees: that ought to be paid by Surís.

"Fourth. That Surís brothers likewise bind themselves to pay the taxes which are owing and for which the municipal council has adjudged to itself twenty acres of the lands of the plantation 'Cristina,' redeeming in this manner the aforesaid acres, which they sell from the present moment to said Stefani for the sum of one thousand eight hundred dollars, of which amount he shall pay one thousand dollars in cash as soon as the land is delivered to him, and eight hundred dollars within one year from the present date. And as evidence they sign, together with the witnesses who are present, two documents, the contents of which are identical, as security for the fulfilment of the foregoing agreement, it being agreed upon that Stefani shall pay the expenses of the deed and the other papers relating to the ownership of the property referred to. San Germán, 9th February, 1882. (Signed) P. M. Stefani. Witnesses. (Signed) Pedro Ma. Rossy."

A few days later, on February 15, 1882, the two brothers Surís executed the deed of consolidation by which several parcels of land were united into one property under the name of "Perseguida," which property contained 40 acres of land, as was mentioned herein in the beginning.

On January 18, 1883—that is, one year after the attachment was issued by the hospital, the execution of the private document and the consolidation of "La Perseguida"—the brothers José Surís, Ramón Ma., and Epifanio Surís, sold by a public deed to Pablo Ma. Stefani two parcels of land, one of 20 acres and the other of 34.9 acres, which, according to said document, were bounded by lands of the charity hospital, the former being bounded by said lands on the south, and the latter on the west. Annexed to the aforesaid deed was a map which had been made by the land surveyor, Carlos B. Hernández, in March of the previous year, 1882, on which map the parcel No. 3, containing 40 acres, appears under the name "Hospital de Caridad"; and it was made to appear in the aforesaid deed that the parcels sold thereby were designated on said map by the numbers 2 and 11, respectively, number 2 being the parcel of 20 acres and num-

ber 11 the one containing 34.9 acres, and, likewise, that the aforesaid lands had been previously sold to Stefani but that the deed had not been executed on account of differences that had arisen, which had been settled by a private document executed on January 11, 1883, by which the brothers Surís had bound themselves to carry into effect the execution of the deed of sale, which they did in this act.

On the same day on which Stefani purchased those two parcels of land—that is, on January 18, 1883—Miss Cristina, Miss Virginia, Miss Luisa, and Miss Margarita Surís leased to Stefani 69 acres of land, which were marked with the number 9 on the map drawn by the land surveyor, Hernández, and which, among other lands adjacent thereto, were bounded on the south by the lands of the charity hospital.

Five years afterwards, in September, 1888, the mercantile firm of Schulze & Co. prosecuted a suit against the Succession of Pablo Ma. Stefani; and, in order to be able to record in the registry of property the attachment they had made of property belonging to said succession, the aforesaid firm instituted possessory proceedings, which were approved and recorded in the same year.

In the petition by which those proceedings began, said firm stated that Stefani, and afterwards his succession, possessed, by virtue of full ownership, the plantation "Imiza" at Sabaná Eneas, which consisted of 302.41 acres of land and was divided into four parcels, the first of which contained 281.97 acres, while the second contained 10.19, the third 7.25 and the fourth 3 acres. The first parcel of 281.97 acres was traversed from east to west by the road leading to Cabo Rojo and also by two local roads running from north to south; and said parcel was bounded on the north by lands belonging to the Misses Surís and the Succession of Báez; on the east by the properties of Santiago Sambolín, the Succession Martínez, and Jacinto Stefani; on the south by the lands of León Negrón, Ramón Gallego, Ulises Ramírez, Succession of Juan Angel Cruz, Josefa Sepúlveda, Sinforoso

Quiñones, and Antonio López; and on the west by the properties of the Succession of Juan Antonio Cruz, Juan O'Neill, Ramón Camacho, the Succession of Feliciano Telésforo Vélez, Sinforoso Quiñones, and others.

That the area of these four parcels of land appears from the survey made at the time referred to, although it differs from the area stated in the tax lists, which difference arises from the fact that when said parcels of land were acquired they were said to have more or less the area above mentioned.

They stated, besides, that there were titles to the second parcel of 10.19 acres, but that there were none to the third and fourth parcels; and that in regard to the first parcel of 281.97 acres there were only titles to 123.15 acres, and that there were none to the remaining 149.82 acres, which would be the subject of a report relating to the possession of the the same by the petitioners.

In the statement of the different acquisitions of the aforesaid 149.82 acres of the first parcel, to which there was no title, it does not appear that any portion of the same with an area of 40 acres had been acquired from the brothers Surís.

The aforesaid possessory proceedings were recorded in the registry of property on October 13, 1888.

On May 5, 1899, Schulze & Co. executed a public instrument for the purpose of consolidating several landed properties into one estate under the name of "Plantation Imiza." In said instrument they first stated that in the executory proceedings prosecuted by them against the Succession of Stefani the property attached therein had been adjudged to them on February 9, 1899; that said property consisted of several parcels of land, one of which containing 25 acres was situated in the ward of Sabaná Eneas, and was bounded on the south by lands of the charity hospital; another containing 34.8 acres was bounded by the same lands on the west; besides there was a parcel of 180 acres, and another

of 170, all of which were recorded on February 28, 1889, which was the reason for the first inscription of the property No. 556; that this latter parcel after having been surveyed was found to contain 114.3 acres and formed the main portion of the plantation "Imiza," which contained the establishments for the production of sugar; while separated from this main portion, although belonging thereto, there were four other portions which, together with the first parcel, make a total of 276.23 acres of land constituting the plantation "Imiza," which area is less than the area stated in the title deeds, because in the latter the number of acres was not accurately set forth, and also because part of the land had been sold.

After these antecedents had been stated, the main parcel of 192.3 acres was described as follows: Bounded on the north by lands belonging to José Roada, the Misses Surís and the Succession of Báez; on the south by the road of Cabo Rojo and a portion of land belonging to José Rabry; on the east by the property of Santiago Sambolín; and on the west by lands belonging to Schulze & Co., being separated by the road from the lands of Bartoli and the portion of land belonging to José Rabry, there being situate within the parcel of land just described two small portions of land belonging to Sinforoso Quiñones, one of four acres and another of two.

By this description of the parcel of 192.3 acres the 40 acres of the charity hospital or of "La Perseguida" marked with the number 3 on the map of March, 1882, are included in said parcel of land.

This appears from the comparison which we have made of the aforesaid map with that of the plantation "Imiza," drawn by Pedro Viadé in 1907, as well as from the expert testimony of Mr. Tomasseti, who in view of those maps, of the deed of consolidation executed by Schulze & Co., and of the demarcation made by himself arrived at that conclusion.

The plantation "Imiza," of 276.23 acres, as described

above, became the property of the Bank of Porto Rico by an adjudication made in favor of the same in the executory proceedings prosecuted by said bank against Schulze & Co., and was afterwards sold by the former to its present possessor, Francisco Plácido. Quiñones.

The complaint alleges that in the year 1883 José S. and Ramón Ma. Surís leased to Stefani the parcel of land of 40 acres claimed therein, and later on to Schulze & Co. when the property of Stefani was adjudged to said firm. This was stated by José Salvador Surís at the trial, but his statement was contradicted by Federico Philippi, a former partner of the firm of Schulze & Co., who testified that he had had business transactions with José S. Surís and with his sisters, because in his transactions with the sisters of said José S. Surís the latter represented the same; that he had never leased any lands from the said José S. Surís, but that he had paid to him the rents due to his sisters, who were represented by him.

In an account covering the period from January 31, 1890, to October 8, 1891, which was sent by the firm of Schulze & Co. to José S. Surís, there appears an entry which reads as follows: ''Lease of acres    *    *    *,'' and a similar entry exists in another account covering the period from April 18, 1893, until October, 1894, which entry is as follows: ''Lease S. Quiñones''; but on September 28, 1894, Schulze wrote to José S. Surís, saying that as he had not been there again since he collected the amount of the last rent, he incloses the first contract, which he must return to him after having been signed by his sisters and by Ramón. But the most explanatory letter is one which has no date, and which reads as follows:

''Friend Surís:. The receipt for the present month of May, which was presented to me, has already been paid. In the future, these receipts must be presented properly signed, for as long as you and I live there is no danger, but when we no longer exist there may arise questions; thus it is that you in future can give me proper

receipts only when they are signed by the same persons who have signed the deed of lease, and who are Virginia Surís, Cristina Surís, Margarita Surís, R. M. Surís, and who must also personally sign with the same signatures that appear on the aforesaid document, and not in the manner in which the receipt was signed the last time.

"I request you to make a note of this. Otherwise I shall not be able to pay any more receipts, because it is not in conformity with the law. Yours, A. Philippi."

In order to solve the conflict existing between these contradictory statements, it is well to make it appear that José Salvador Surís said in another part of his testimony that, notwithstanding the fact that he had stated to the municipal council of San Germán that the 12 acres of land which he had sold to said council formed part of the parcel of land mortgaged to the hospital, that was not true; and that he had only said so for the purpose of raising obstacles; and it must likewise be made to appear that he did not present any public or private document relating to the lease alleged by him, and that he did not introduce any evidence in regard to the lease to Stefani of the aforesaid 40 acres of land, with the exception of his own testimony to that effect.

José Salvador Surís, Ramón María Surís, and the heirs of the latter, as well as Juan Surís Cardona, son of the aforesaid José Salvador Surís, have always resided in the city of San Germán, at a very short distance from the property claimed in this suit, according to the testimony of the witnesses, Abelino Cruz, Gavino García, Francisco Morati, and others.

The legality of the private document of February 9, 1882, was proven by means of the testimony of the expert penmen, Alejandro Díaz and Maximino Cuevas, who, after comparing the signatures appearing in said document with other undoubted signatures, testified and declared that the signature of J. S. Surís, which appears in the said private document, had been written by the same hand that wrote the

undoubted signature; and the second of the aforesaid penmen made the same declaration with regard to the signatures of Stefani and the witness Rossy.

Against the judgment which in the lower court terminated this suit the plaintiff has alleged two classes of errors, some of which refer to the procedure while the others have reference to the substantive rights applicable to this case. We will form a group of the former and consider the same before we proceed to the second class of errors.

Under the first group we can unite the errors assigned under the numbers 1, 8, and 9, which have been stated in the following manner:

1. The District Court of Mayagüez erred in not considering as proven in favor of the plaintiff the facts contained in the allegations 8, 10, and 16 of the amended complaint, which allegations were neither excepted to nor denied by the defendants.

In order to decide this first point, it is necessary to observe that the complaint was filed on September 11, 1907, on which day it was sworn to by the plaintiff; and that, after the same had been answered by the defendants, the plaintiff requested permission to amend the complaint, which permission was granted to him on May 4, 1908, and the plaintiff then amended his complaint, presenting on the 13th of the same month and year, not a new amended complaint, but a writing which contained the amendments to the complaint, which writing was not sworn to.

All this appears from the statement of the case approved by the judge notwithstanding the fact that in the judgment roll the original complaint, with the amendments presented afterwards, appears to be redrawn in a single allegation as the amended complaint, and so it happens that said amended complaint bears the same date as the original one, without containing any other affidavit than that of September 11, 1907, which is the affidavit of the original complaint. In short, the amendments were not sworn to.

In the eighth original allegation it was asserted that the 40 acres of land claimed in this suit have never been and are not now the property of the hospital, which never had possessed any lands that were recorded in the registry of property; and it was further stated in said allegation that the property claimed belonged to the brothers Surís each of them possessing one-half thereof, and that by the death of Ramón María Surís the latter's half of said property had been inherited by his heirs, and that Juan Surís Cardona was at present the owner of the entire property by virtue of the purchase of the same for the price of $5,500, according to the deeds of July 14 and 22, 1907, recorded in the registry of property, in which the said property is described in accordance with the present condition of the same. And upon describing the aforesaid landed property, the amendment adds to the properties, by which the same is bounded, the plantation "Imiza" on the south.

The tenth original allegation states that Stefani mortgaged to Schulze & Co. a parcel of 20 acres of land and another of 24.9 acres during the years 1886 and 1887; that after the death of Stefani the aforesaid firm prosecuted executory proceedings against his succession, in which, among other properties, the aforesaid parcels of land of 20 acres and 24.9 acres were adjudged to said firm, which took possession thereof.

The amendment to this allegation consisted in adding thereto that, during the prosecution of the aforesaid executory proceedings, Schulze & Co. instituted possessory proceedings in order to record the properties of Stefani, in which proceedings the property of 40 acres of land does not figure, which property is the subject of these possessory proceedings, which were approved and recorded in the name of Stefani and afterwards in that of Schulze & Co.

The sixteenth original allegation states that according to the deed of consolidation executed by Schulze in 1889, the properties of 20 acres and 24.9 acres, were adjacent to lands

of the charity hospital; and with the aforesaid parcels and other portions said properties formed the parcel of 192.3 acres, which at the time of the consolidation was bounded on the south and on the west by the lands of the charity hospital, but that on consolidating the said properties Schulze & Co. omitted the aforesaid boundary, substituting therefor that of the plantation "Imiza," and that in this manner the 40 acres of land which were called the hospital lands were inclosed in the property above mentioned, although for this reason they were not recorded in the registry of property.

This allegation was amended so as to eliminate the portion in which it was said that the property which is the subject of this suit had been inclosed in the consolidated property in consequence of the substitution of boundaries, and to state in lieu thereof that the parcel of 192.3 acres could not be consolidated, because as the same was formed among others by two portions of land which were bounded, and are bounded, by lands of the charity hospital the said portions were not adjacent and are not all adjacent to each other, because they were and are separated by the lands of the hospital; but that Schulze & Co., in order unduly to consolidate the portions of 20 acres and those of 24, 114, 10, and 14 acres and thus to form a parcel of land of 192.3 acres, maliciously omitted the boundary of the hospital lands and substituted therefor that of the plantation "Imiza"; and by such illegal and fraudulent omission or substitution the lands of the hospital were inclosed within the parcel of 192.3 acres, or within some of the portions of land comprised in the perimeter of the plantation "Imiza," although in consequence of this the property claimed was not recorded in the registry of property in the name of Schulze & Co.

From the aforesaid it will be seen that the amendment to the eighth allegation consisted exclusively in the addition of a boundary to those set forth in the description of the

property, and although this amendment is true, it must not be held for this reason that the entire allegation was true.

The amendment to the tenth allegation does not essentially modify the original allegation which had been denied; and as regards the sixteenth allegation, the greater part of the amendment consists of considerations and views of the plaintiff as a consequence of the statements made by him in the original allegation.

Since none of these three amendments alleged any fact essential to the suit, the non-denial of the same does not imply that the court must consider the same to be true, and much less that for lack of denial of the same, even supposing that they contained essential facts, the remaining particulars stated in the original complaint which had been denied must be considered as true and proven; for which reason the court did not commit the error of which complaint is made.

Error VIII. The inferior court erred in not considering as insufficient both the answer of the Bank of Porto Rico and the answer containing the new matter of defense of the defendant, Francisco Plácido Quiñones.

We have stated in the beginning what the essential facts of the complaint are; we said that they had been denied by the Bank of Porto Rico and by Francisco Plácido Quiñones, and we stated likewise the facts which the latter alleged as new matter of defense to the complaint.

As a ground of the assignment of error, the plaintiff and appellant maintains that the answers do not conform to law, because the Bank of Porto Rico denies, upon information and belief, the facts alleged in the complaint, which appear in public documents duly filed, some of which facts relate to the documents constituting the title to the plantation "Imiza," of which the aforesaid bank has been the owner; and that with regard to said facts the answer of the bank and that of Quiñones are evasive, because they could have

examined those documents before denying their contents or
admitting the same.

The manner of denying a sworn complaint, in order that.
said denial may constitute a defense or opposition thereto,.
is positive when the facts are a matter of personal knowl-
edge of the defendant, or upon information or belief when
they are not known to him.

If the facts appear in written documents which were exe--
cuted by the defendant, only a positive answer will avail,
because presumptively the facts appearing therein are a mat-
ter of his personal knowledge; but if he did not intervene
in said documents, then, for the reason that the said facts
are not within his *personal* knowledge, he may answer upon
information and belief. (See *Curtis* v. *Richards & Vantine,*
9 Cal., 33.)

In the present case the facts denied upon information and
belief all relate to facts in which the defendants did not
*personally* intervene, although said facts appear in public
documents; and the defendants are not obliged by virtue of
a sworn complaint to go from one set of archives to another
in order to examine those documents. If the doctrine which
the appellant tries to establish were admitted, the defendant
would be obliged, in the case of public documents, to examine
all the archives in any part of the world, wherever the
document might be.

It is true that some of the allegations referred to in the
assignment of the alleged errors have reference to the docu-
ments constituting the title to the plantation "Imiza," which
at the present time is the property of Mr. Quiñones and for-
merly belonged to the Bank of Porto Rico; but, although
they are particulars relating to those documents, they do
not appear in documents in which the defendants have per-
sonally intervened, but in previous documents.

It is also alleged that the denial of a certain allegation
of the complaint—that is, allegation 21—is null and void,
because the latter does not contain a fact but a conclusion

of law, which it was not necessary to deny; it being likewise alleged that another allegation, which was also denied, is only a note of the documentary evidence of which the plaintiff intends to avail himself at the trial.

This being so, the defendants were under no obligation to deny those allegations, and the fact that they have denied the same does not annul their answer, nor does it render the latter defective, if by having properly denied the material facts of the complaint it constitutes a defense thereto. It is only necessary to deny the material allegations of the complaint.

It is likewise alleged that certain allegations of the complaint, to wit, those marked with the numbers 17 and 18, have been insufficiently denied by the Bank of Porto Rico, because the bank does not deny each fact stated in said allegations, but admits some of them and contradicts others.

The answer of the Bank of Porto Rico with regard to the seventeenth allegation was to the effect that it acknowledges as true the facts set forth in the first sentence thereof up to the point where it reads, "Allegation 15," and denies all the other facts stated therein. In regard to the eighteenth allegation, said bank acknowledged as true the facts set forth in the first paragraph thereof, and denied the rest. When an allegation is complex, comprising several clauses or propositions, *each* part of a proposition must be denied separately, as it is not sufficient that the propositions be generally denied. (*More* v. *Del Valle et al.*, 28 Cal., 170.) Applying the doctrine, we find the answer of the Bank of Porto Rico to these two allegations to be correct, because it distinguished the part which was true from the part which was not true. In view of the aforesaid propositions we find that the court has not committed the error imputed to it in this paragraph of the assignments.

Error IX. An answer which does not allege sufficient facts to constitute an opposition or defense to the complaint is null and void and must be dismissed.

This assignment of error is based on the allegation that the denials contained in the answers are evasive, defective, and insufficient, and that the new matter adduced by the defendant Quiñones is not really new matter, inasmuch as it is immaterial, inconsistent, and redundant, for which reason said answers cannot be taken into consideration by the court, according to section 123 of the Code of Civil Procedure, which reads as follows:

"Sham and irrelevant answers, and irrelevant and redundant matter inserted in a pleading, may be stricken out upon such terms as the court may, in its discretion, impose."

We have already said that the answers of the Bank of Porto Rico and that of the other defendant, Quiñones, are sufficient and in accordance with the law of procedure; therefore we have now only to examine whether the new matter adduced by Mr. Quiñones constituted a defense to the complaint.

The landed property, "Perseguida," consisting of 40 acres of land, is claimed from Mr. Quiñones, which property is alleged to be comprised in and inclosed by the plantation "Imiza," belonging to him; and if that is true, then the matter which is adduced by said Quiñones as new matter is pertinent, for it is, in substance, an allegation limited to the following facts; that the aforesaid Quiñones possesses the plantation "Imiza" by virtue of a just title of purchase in the same manner as it was possessed by the Bank of Porto Rico, by Schulze & Co., who possessed said plantation prior to its possession by the bank, and by Pablo Ma. Stefani, who was the first possessor thereof; which facts are stated in order to allege the prescription of the ownership that might exist against the plaintiff. By the aforesaid statement alone it is shown that the error alleged does not exist.

Having thus decided the questions involved in the assignment of error affecting the procedure, we will now enter upon an examination of the other group of errors, which are

of a substantive character. The second assignment of error reads as follows: "The district court erred in not considering as proven in favor of the plaintiff and against the defendants the facts referring to the title of ownership of the plaintiff, and the inscription of said title in the registry of property." The ground of this assignment of error is that the plaintiff at the trial introduced as evidence the deeds relating to the 17 portions of land which, consolidated into one property, form the estate called "Perseguida," containing 40 acres of land (the plaintiff presented only 16 deeds); the deed of consolidation of the same executed by José Surís and Ramón Ma. Surís; the certificate showing that said deed was presented in the registry of property in the name of the gentlemen who executed the same; a certificate showing that the undivided half of the aforesaid estate belonging to Ramón María Surís had been recorded in the same registry in favor of his heirs; the deeds by which José S. Surís and the heirs of Ramón Ma. Surís sell the aforesaid property to Juan Surís Cardona, with a note proving that the same have been recorded in the registry of property, and that it is alleged that since the aforesaid documents have not been impugned as false or null and void the plaintiff has proven his title to the property claimed by him, and that the lower court, by not holding that said title had been proven, had infringed the doctrine of the Supreme Court of Spain and that laid down by the Supreme Court of Porto Rico in the case of *Verges et al.* v. *Domingo Pietri et al.* (9 P. R., 20), which doctrine is to the effect that in order that a party may avail himself of an action for recovery the existence of a true title to the thing which is the subject of the recovery is necessarily required.

This doctrine is correct; but the fact that the lower court has rendered judgment against the plaintiff does not necessarily lead to the conclusion that it has failed to apply said doctrine, inasmuch as said court may have held that Juan Surís Cardona had purchased the property to which his title

referred and that, nevertheless, there may have been some legal ground on account of which he was prevented from recovering the same as, for instance, if the defendant Quiñones had acquired said property by prescription in view of other evidence introduced at the trial.

Error III has been imputed to the court, for the reason that the latter did not consider as proven in favor of the plaintiff the facts showing the identity of the landed property claimed in the complaint.

In regard to this error, we say the same as we have said with reference to the preceding one.

In view of all the evidence, we think—and perhaps the lower court was also of the same opinion—that the property which the brothers Surís mortgaged to the charity hospital, which property consisted of 40 acres and was formed by 16 parcels of land which afterwards were consolidated into a single property and recorded in the registry of property by the aforesaid brothers Surís who later on sold the same to the plaintiff herein, is included within the area of the present plantation ''Imiza'' of the defendant Quiñones; but this fact alone does not necessarily lead to the conclusion that judgment must be rendered in favor of the plaintiff.

The fourth error is alleged to consist in the matter that the court did not consider as proven in favor of the plaintiff the facts showing the possession which the defendant Quiñones has of the lands in litigation, whereby said court infringed section 355 of the Revised Civil Code, which provides that an action for recovery must be directed against the party who possesses the property to be recovered or who retains or detains the same. We do not believe that the error alleged has been committed; and what we have said in regard to the two preceding assignments of error is also applicable to the present one.

The fifth error assigned will be discussed at the end of this opinion after we have examined all the other errors, on account of the nature of the same.

The real question to be decided in this suit is contained
in the sixth, seventh, and tenth assignments of error, which
we will discuss together; but before doing so and as a con-
sequence of what we have said, we wish to state that in our
opinion it has been proven that 16 of the 17 parcels of land
which, during the years from 1860 to 1870, were purchased
from different persons by the brothers Surís, were mort-
gaged by the latter to the charity hospital, according to the
boundaries stated in the mortgage deed; that they were the
same parcels which afterwards, together with another par-
cel, 17 in all, were consolidated into a single property in
1882 and recorded in the registry of property; that they
are the same that were purchased by the plaintiff, as stated
in his deed, and that they are included in the plantation
"Imiza," which is the property of the defendant Quiñones,
who purchased the same from the Bank of Porto Rico, which,
in turn, had acquired said plantation from Schulze & Co.,
who had derived it from the Succession of Pablo Stefani.

Now let us see whether, notwithstanding this, some fact
has occurred which prevents Francisco Surís Cardona, the
plaintiff herein, from recovering the aforesaid estate. Dur-
ing the trial a private document dated February 9, 1882, was
introduced; and it is alleged that by admitting the same the
court committed an error, which is marked with the number
VII. As a reason why it should not have been admitted, it
is said by the appellant in the first place that the aforesaid
document is false; in the second place that it is null and
void; in the third place that it is ineffectual against a third
party; and in the fourth place that the actions originating
therein have prescribed.

Upon admitting said document the judge of the lower
court held that it was not false in view of the evidence intro-
duced in regard to the authenticity of the same; and as it has
neither been alleged nor shown that he acted under the in-
fluence of passion, prejudice, or partiality, or that he com-
mitted a serious error in the consideration of the evidence

relating to this point, we will not disturb the conclusion at which he arrived, especially as we have carefully examined the evidence referred to, and we have no doubt whatever in regard to the genuineness of the aforesaid document, for the reason that the signatures written at the end of the same are authentic.

The whole argument of the appellant concerning the nullity of said private document is based on the allegation that Stefani acted as attorney in fact of the charity hospital and was not authorized to give his consent in the name of said hospital, and that the document referred to is not signed by two witnesses.

The first point is based on the erroneous supposition that Stefani purchased the property in question for the hospital and that he acted as attorney in fact of the latter since the statement that the deed was executed in favor of said institution is not sufficient to warrant that conclusion. According to the text of the document, Stefani is the purchaser and also the one who pays the price; and the arrangement that the deed be executed in favor of the hospital may indicate the existence of another contract between him and the aforesaid creditor, but not that the latter purchases the property directly from the brothers Surís by means of the representation of Stefani.

With regard to the allegation that the lack of the signatures of two witnesses in the document referred to makes the latter null and void, we must say that from the time of the *Novísima Recopilación,* Law I, Title I, Book I, a man is bound in whatever manner he may be willing to bind himself, and therefore the obligation is not rendered ineffectual through the lack of external requisites. Besides, the quotation made by the appellant of Law LXI, Title XVIII, *Partida* III, has reference to the requisites of public documents which are also required by our law concerning notaries public and the Mortgage Law and is not applicable to a private document, for which no law prescribes such a requisite.

But it is further asserted that at all events the private document is ineffectual to prejudice a third party; and that if the said private contract is neither false nor null and void, then this would be a case of a double sale of the same property. In order to discuss this question, it is necessary to make it appear that José S. Surís while testifying stated that he carried on a friendly intercourse with his son, Juan Surís Cardona, who according to his statement has no capital or fortune whatsoever, although he possesses some property and formerly had a house which he had built, but nothing more; and that this witness, who testifies minutely in regard to facts which occurred during a period of 30 years, who even remembers many of the owners of the properties that were adjacent to the lands or estates purchased by him during those times, does not remember the price for which the landed property claimed in this suit was sold by him and his nephews to the plaintiff herein.

We will also state that a few months before the sale was made to Juan Surís Cardona his father intended to render the landed property in question for the purposes of taxation, and for this work, and for his representative in this affair, he engaged an attorney who is the same who at present defends the plaintiff; and this attorney wrote a letter to Mr. Tomassetti requesting the latter to inform him in what part of the plantation "Imiza" the property in litigation was situated before attesting as notary public the deeds of purchase executed in favor of the plaintiff; and we must call to recollection, as we have said before, that Juan Surís Cardona and his vendors have always lived at San Germán and entertained a friendly intercourse with each other.

It is certainly very strange that a son should allege that what his father sold to him he had also sold before to another person, and that he should endeavor to uphold the sale made to him to the prejudice of the other person who made the transaction with his father by availing himself of the protection afforded by the provisions of the law which, in such

cases, protect the party who was the first in recording his title.

In view of the manner in which the facts have occurred, we have no doubt whatever that the deeds of sale of the property in question executed in favor of Juan Surís Cardona have had no other purpose than that he should institute this suit to avail himself of and assert his rights as a third party and thus save his father and the heirs of his uncle from the consequences of the private document executed in favor of Stefani; and we are likewise convinced that the plaintiff knew the history of the said property before he made his purchase, and that his father and his cousins had not possessed the same since 1882, as stated in the complaint.

Under such conditions the plaintiff cannot claim the benefits which the law grants to third parties, because nobody can be a third party who, although he had not intervened in the first contract of sale, purchased, however, knowing that his vendors were not the owners and had no possession of the property sold. The same doctrine has already been established by this court in the case of *Voigt* v. *Ribas* (1 Decisiones de Puerto Rico, 60), decided May 10, 1900.

Besides, the defendant recorded before the plaintiff the landed property which is the subject of the complaint, for the plantation "Imiza" within which, according to the assertion of the plaintiff, is comprised the property which he claims by virtue of the consolidation made by Schulze & Co., was recorded in the registry of property prior to the inscription of the deeds of purchase executed in favor of the plaintiff.

The allegation of the appellant that the price of the sale depended upon a liquidation, and that, therefore, so long as said liquidation had not been made the sale did not exist, is not true, for it clearly appears from the context of the document above mentioned that Stefani purchased the property for the sum of $5,800, with which he was to pay the debt due, together with the interest and the costs. And that

the purchaser Stefani made the payment is shown by the fact that he ordered that the deed be delivered to the hospital, doubtless while the payment was being made, and that it has neither been alleged nor proven that the brothers Surís had to pay those amounts which represented the $5,800 of the purchase price. The purchase money had been delivered from the moment when Stefani accepted as his own the liabilities of the brothers Surís.

It is useless to determine whether the actions originating in the private contract have prescribed, because the property sold and the price thereof having been delivered, there is no longer any reason for instituting those actions nor for executing any deed, for the property in question is recorded by virtue of the inscription made of the consolidated estate "Imiza," nor are those actions now instituted. In short, the private contract of purchase and sale between the brothers Surís and Stefani is a legitimate contract; it is lawful and has produced the effect of conveying to the purchaser the ownership of the property claimed, and affects the plaintiff by reason of the circumstances which he knew when he acquired the property referred to.

Although objections were made to the admission of the private document, said objections were based only on the ground that the signatures were false, and, therefore, as it was shown that those signatures were not false, all other objections were abandoned. (*The People of Porto Rico* v. *Silva* [17 P. R., —], decided May 18, 1911, and *Falero* v. *Falero* [15 P. R., 111], decided February 19, 1909, both of which decisions were rendered by this court.)

Consequently, on February 9, 1882, the brothers Surís ceased to be the owners of the property which is the subject of the aforesaid private document, and from that time said property has been publicly, quietly, and peacefully possessed by Stefani, afterwards by Schulze & Co., who consolidated the same with other lands belonging to them and recorded said property with the plantation "Imiza"; later

on it was possessed by the Bank of Porto Rico, and, lastly, by Quiñones, so that more than 10 years have elapsed since said possession commenced, which among present parties is a title sufficient to acquire the ownership by prescription, if there exists, as does in the present case, a just title of purchase made in good faith.

Wherefore the judgment which in view of all the antecedents hereinbefore stated was rendered by the District Court of Mayagüez was consistent with the pleadings and the evidence, and it is unnecessary to discuss the claim relating to the products of the property referred to.

For the reasons stated the appeal should be dismissed and the judgment from which this appeal is taken should be affirmed.

*Affirmed.*

Chief Justice Hernández and Justices Wolf and del Toro concurred.

Mr. Justice Aldrey did not take part in the decision of this case.